## ARIZONA COMMERCIAL MINING CO. v. CASEY, Collector of Internal Revenue.

District Court, D. Massachusetts.
April 9, 1929.

No. 2239.

Dunbar, Nutter & McClennen and Edward F. McClennen, all of Boston, Mass., for plaintiff.

Frederick H. Tarr, U. S. Atty., and J. Duke Smith, Asst. U. S. Atty., both of Boston, Mass., for defendant.

BREWSTER, District Judge. This is an action brought to recover income and excess profits taxes assessed for the year 1917. The plaintiff duly returned and paid on its 1917 income an income tax of $20,-575.24 and an excess profits tax of $1,880.90, or a total of $22,456.14. Early in 1920 the Commissioner of Internal Revenue assessed an additional excess profits tax of $36,044.-30 which, on March 2, 1920, the plaintiff paid under protest to avoid penalties.

On October 19, 1920, the plaintiff filed with the collector of internal revenue for this district a claim for a refund of $27,325.-75, which claim was rejected on December 22, 1923.

The plaintiff's claim for refund was based wholly on the act of the Commissioner in reducing by $2,000,000 the amount of plaintiff's invested capital upon which the excess profits credits were computed.

In January, 1924, the plaintiff brought suit to recover the whole amount of the additional assessment, or $36,044.30. In its declaration it alleged (1) that it was entitled to a further deduction from gross income, for depletion during the year of its ore bodies, of $29,380.22; and (2) that it was entitled to have included in its invested capital the full cash value of property exchanged for $1,300,000 par value of stock originally issued by the plaintiff, instead of the par value of said stock which had been adopted by the Commissioner of Internal Revenue in fixing the amount of such invested capital.

The case was referred to an auditor, who heard the parties and made his report to this court. Jury trial was waived, and the case is now presented on its merits, to be considered on the auditor's report and documents introduced in evidence.

■ At the outset we are met with the claim of the defendant that the plaintiff cannot recover in this suit any tax based upon an asserted right to an additional deduction for depletion. This claim is grounded on the alleged failure of the plaintiff to comply with the requirements of statute and of the regulations of the Secretary of the Treasury established in pursuance thereof (R. S. § 3226 [26 USCA § 156] and article 1036, Treasury Regulations 45 [1920 Ed.]). Since Tucker v. Alexander, 275 U. S. 228, 48 S. Ct. 45, 72 L. Ed. 253, it can no longer be doubted that the defendant could insist upon literal compliance with these statutory requirements, and that such compliance, if insisted upon, is a condition precedent to the right of the taxpayer to maintain a suit for the recovery of taxes erroneously assessed. This case is also authority for the proposition that such compliance may be waived by the United States or by the collector, if no statute of limitation is involved.

■ It is the plaintiff's contention that it complied with the legal requirement relating to a claim for refund, and further that, if it did not literally comply, such compliance was waived by the defendant.

Taking up first the plaintiff's claim that it sufficiently complied with the statute. Section 3226 of the Revised Statutes (U. S. Code, title 26 [26 USCA] § 156) provides that: "No suit or proceeding shall be maintained * * * for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected * * * until a claim for refund or credit has been duly filed with the Commissioner of Internal Revenue, according to the provisions of law in that regard, and the regulations of the Secretary of the Treasury established in pursuance thereof."

Article 1036 of Treasury Regulations 45, in force when the claim for refund was filed, requires that such claim "shall be made on form 46 (revised)" and that "all the facts relied upon in support of the claim should be clearly set forth under oath."

The plaintiff attaches some importance to the fact that, when it paid the additional assessment under protest, it inserted on the face of the notice and demand the words "paid under protest and claim appearing on back," and on the 'back of the claim made the following indorsement:

"This payment $36,044.30 is paid under protest because of demand and to avoid penalties. Refund is claimed because said assessment and several parts thereof are unwarranted in fact and by any constitutional provision of any Act of the United States under which the assessment purports to be made.

"Arizona Commercial Mining Co.,
"By C. H. Altmuller, Treasurer."

This notice and demand was receipted and returned to the plaintiff by the collector of

internal revenue. This procedure falls far short of the requirements of the regulation. The claim was not under oath. The facts relied upon in support of the claim were not set out. It was not made on form 46 (revised), nor was it duly filed with the Commissioner. That the plaintiff did not regard this statement as sufficient to establish its rights to a refund is indicated by the claim, filed about seven months later, which was submitted on form 46, verified and filed in accordance with the applicable regulation. In this claim the plaintiff sets out the facts relied upon in support thereof, as follows:

"The Arizona Commercial Copper Company, predecessor to the Arizona Commercial Mining Company, had a paid-in capital of $4,000,000, represented by capital stock of $3,000,000 and bonds of $1,000,00. These were exchanged on or about July 12, 1912, for capital stock in the reorganized corporation (the present company), stock of the par value of $1,300,000. No new interests whatsoever came into the reorganization. The reorganized corporation has set up on its books a paid-in surplus of $2,000,000, representing a portion of the $2,700,000 difference in the investment in the predecessor company and the capital stock of the reorganized company. This addition to surplus was eliminated from the invested capital of the petitioner in the government audit of the corporation's income and excess profits tax return for the year 1917. This elimination resulted in an excessive assessment of $28,055.43 refund whereof is hereby claimed. (See attached memorandum for corrected computation of the tax.)"

The amount of the refund claimed was later corrected to read $27,325.75.

From the text of the claim and the accompanying computations, it is clear that the only act of the Commissioner of Internal Revenue which the plaintiff deemed erroneous was the reduction to the extent of $2,000,000 of the amount of the invested capital of the corporation. Its sole claim was for a refund of $27,325.75 resulting from this reduction. The claim to a deduction from income for depletion was never specifically brought to the attention of the Commissioner and he never passed upon it.

This presents the question whether this failure to set forth in the claim this additional ground for a refund precludes the plaintiff from recovering in this action any overpayment of tax upon income which was not reduced by the alleged depletion. The federal courts in other jurisdictions are not wholly in accord as to the necessity of setting out in the claim for refund the same ground for a refund as that relied upon for a recovery in the courts. In the Circuit Court of Appeals for the Eighth Circuit, it has been stated that "the precise ground upon which the refund is demanded must be stated in the application to the Commissioner, and we think, if that is not done, a party cannot base a recovery in the court upon an entirely different and distinct ground from that presented to the Commissioner." Kenyon, J., in Red Wing Malting Co. v. Willcuts, 15 F.(2d) 626, 49 A. L. R. 459. See, also, Tucker v. Alexander (C. C. A.) 15 F.(2d) 356. Recent decisions in the District Court of Connecticut hold otherwise. Union & New Haven Trust Co. v. Eaton, 20 F.(2d) 419. Warner v. Walsh, 24 F.(2d) 449.

While Tucker v. Alexander, supra, was reversed in the Supreme Court on the ground that the defendant had waived compliance with the statute and regulations, the opinion contains language which has a strong tendency to support the views entertained in the Eighth Circuit. Mr. Justice Stone, after referring to section 3226 and the Treasury Regulations established in pursuance thereof, stated that in view of the government's waiver of objections to the sufficiency of the description of the claim filed, it was not necessary to consider the precise extent of the requirements prescribed by statute and regulations, but he added that "literal compliance with statutory requirements that a claim or appeal be filed with the Commissioner before suit is brought for a tax refund may be insisted upon by the defendant, whether the collector or the United States." Tucker v. Alexander, 275 U. S. 228, 231, 48 S. Ct. 45, 46 (72 L. Ed. 253).

In order to literally comply with section 3226, it must be necessary for the taxpayer to duly file with the Commissioner a claim for refund "according to the provisions of law in that regard, and the regulations of the Secretary of the Treasury established in pursuance thereof." It is not a sufficient compliance to file a claim for refund without specifying the grounds upon which the claim is based. The regulations require that all the facts relied upon in support of the claim should be clearly set forth under oath. As has been several times indicated in the opinions, the purpose of the statutes and the regulations is to afford the Commissioner an opportunity to correct errors made by his office and to spare the parties and the courts the burden of litigation in respect thereto. Tucker v. Alexander, supra; Union Trust

Co. of Pittsburgh v. McCaughn (D. C.) 24 F.(2d) 459, 461; Feather River Lumber Co. v. U. S. (Court of Claims, May 28, 1928).

While I would not go so far as to say that a taxpayer would be limited to the recovery of the precise amount appearing in his claim for refund, I am of the opinion that he cannot file a claim for refund on one ground and, if that claim is rejected, proceed to sue for a recovery based upon entirely different and distinct grounds. A suit cannot be maintained upon a claim of a nature different from that shown in the formal claim for refund, according to the views reflected in recent opinions. Meinrath Brokerage Co. v. Crooks (D. C.) 28 F.(2d) 991; Ritter v. United States (C. C. A.) 28 F.(2d) 265; Stauffer Eshleman & Co. v. U. S. (Court of Claims, October 15, 1928).

█ But it is urged that any omission to state fully the grounds relied upon was waived by the defendant.

It appears that when the case was before the auditor for argument, the defendant conceded in his brief that one of the issues of fact before the auditor was whether and to what extent the plaintiff was entitled to an additional deduction for depletion. This statement in the brief is the sole ground upon which the plaintiff bases its argument that compliance was waived. I do not think the argument can be sustained, in view of the pleadings and the record before me. The plaintiff alleged in its declaration a due and sufficient claim for refund of the entire amount sued for. Defendant filed a general denial, which necessarily involved a denial of the allegation. One of defendant's requests for findings, filed with the auditor, was that the "Plaintiff produced no evidence that any claim for refund was filed with the collector of internal revenue as required by law, or that such claim had been rejected by the Commissioner of Internal Revenue."

Inasmuch as the plaintiff claimed that it had duly filed with the collector of internal revenue at Boston a claim for a refund of the entire additional tax, it would be proper, if not necessary, for the auditor to make an alternative finding respecting the right of the plaintiff to a further deduction for depletion. To submit a brief on that issue was in no way inconsistent with the defendant's objection that the plaintiff had failed to comply with the statutory requirements. The facts disclosed on the record before me are clearly distinguishable from those confronting the court in Tucker v. Alexander, supra. In that case, Mr. Justice Stone observed that "during the entire course of the trial no question was raised as to the sufficiency of the claim for refund," and it further appears from the opinion that counsel stipulated that the court might consider the issue submitted, and this stipulation was well within the period limited for the filing of claims for refund.

In the case at bar, the question of the sufficiency of the claim was raised in the pleadings and at the hearing before the auditor, and moreover the time within which claims for refund could be filed had expired long before the defendant filed his brief with the auditor. See R. S. § 3228; section 1112, Revenue Act of 1926 (U. S. Code, tit. 26 [26 USCA] § 157). I find and rule on this aspect of the case that the defendant did not, by his course of conduct, waive compliance with the statute and regulations.

It follows, therefore, from these observations, that the plaintiff is not entitled to recover, in this action, any tax computed upon income which had not been reduced by the actual depletion during the year 1917 of its ore bodies as of March 1, 1913, to the extent of $29,380.22, and I so rule.

This exclusion renders it unnecessary to consider the somewhat complicated findings of the auditor relative to plaintiff's alleged claim for further deduction for depletion. █ The next question is whether the plaintiff can recover upon its allegations that it was entitled to have included in its invested capital the $2,000,000 disallowed by the Commissioner.

The pertinent facts bearing upon this issue, as found by the auditor, are as follows:

The plaintiff was organized as a mining corporation under the laws of the state of Maine, on April 4, 1912, with an authorized capital stock of $1,500,000, divided into 300,000 shares, of a par value of $5 each. Its organization was a part of a plan of reorganization of the affairs of the Arizona Commercial Copper Company (hereinafter referred to as the "Copper Company"), which had an outstanding capital stock of $3,000,000 and a bonded indebtedness of $1,000,000. The plaintiff was organized for the purpose of succeeding to the business and property of the Copper Company. The plan of reorganization provided for the deposit with a reorganization committee of the bonds and stock of the Copper Company. Before the plaintiff was organized the reorganization committee had acquired practically all of the bonds and a portion of the stock of the Copper Company.

The plaintiff, on April 9, 1912, voted to purchase of the committee all the property

held by it, consisting principally of the deposited bonds of the value of $998,500 and 115,646 shares of the common stock of the old company, together with approximately $300,000 in cash which had been paid in to the committee by the old stockholders, pursuant to the plan of reorganization. For these stocks and bonds the plaintiff issued to the committee 260,000 shares of its stock having a par value of $1,300,000. Of these shares 140,000 were distributed to bondholders of the old company, and 120,000 shares went to holders of stock in the old company, who had elected to come into the reorganization and had paid $3 for each share issued to them.

On July 11, 1912, the assets of the Copper Company were sold at a foreclosure sale to a representative of the reorganization committee for the sum of $1,000,000. The purchaser assigned his bid to the plaintiff and the plaintiff surrendered to the receiver of the Copper Company the $1,000,000 of bonds of that company as payment of the purchase price, and the receiver conveyed the assets directly to the plaintiff.

On July 11, 1912, the assets of the plaintiff corporation as shown by the set-up on its books was:

| | |
|---|---|
| Real estate and property | $1,300,000 00 |
| Other assets | 306,391 69 |
| Total | $1,606,391 69 |

And the following liabilities:

| | |
|---|---|
| Capital stock | $1,300,000 00 |
| Surplus | 306,391 69 |
| Total | $1,606,391 69 |

This surplus was the $360,000 received from the stockholders, less certain adjustments.

The result of all this was to set up the fixed assets on the books of the new company at $2,747,553.28, less than they were on the books of the old company.

Until 1917 this real estate and property thus acquired was carried on the books of the plaintiff at $1,300,000. A further entry on the assets side was made as of December 31, 1917 (by whose direction it did not appear in evidence), as follows:

"For value of property conveyed in excess of stock issued March 19, 1912, $2,000,000."

And, at the same time, on the liability side, profit and loss was credited with a like amount, and in the tax return for the year 1917 the additional $2,000,000 was treated as a part of the invested capital of the company. It is this $2,000,000 additional which the plaintiff now claims should be treated as a paid-in surplus, and which the Commissioner of Internal Revenue has disallowed as a part of the invested capital.

The provisions of internal revenue law applicable to this case are to be found in the Revenue Act of October 3, 1917, § 207, 40 Stat. 306. The material parts of this section are:

"Invested capital * * * means: * * * (a) In the case of a corporation * * * (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation or partnership, at the time of such payment (but in case such tangible property was paid in prior to January first, nineteen hundred and fourteen, the actual cash value of such property as of January first, nineteen hundred and fourteen, but in no case to exceed the par value of the original stock or shares specifically issued therefor); and (3) paid-in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year: Provided, that (a) the actual cash value of patents and copyrights paid in for stock or shares in such corporation or partnership, at the time of such payment, shall be included as invested capital, but not to exceed the par value of such stock or shares at the time of such payment, * * * but good will, trade-marks, * * * or other intangible property, bona fide purchased, prior to March third, nineteen hundred and seventeen, for and with * * * shares in the capital stock of a corporation (issued prior to March third, nineteen hundred and seventeen), in an amount not to exceed, on March third, nineteen hundred and seventeen, twenty per centum * * * of the total shares of the capital stock of the corporation, shall be included in invested capital at a value not to exceed the actual cash value at the time of such purchase, and in case of issue of stock therefor not to exceed the par value of such stock."

If the $2,000,000 in controversy can be said to constitute a part of the invested capital, it is because it will come in under the definition of invested capital as paid-in surplus. The plaintiff could not increase its invested capital by marking up its assets to correspond to a mere appreciation in value over cost. La Belle Iron Works v. United States, 256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998.

There are decisions of the Board of Tax Appeals involving the Revenue Act of 1917

which hold that, when tangible property is acquired by a corporation in exchange for its stock and the value thereof is clearly and substantially in excess of the par value of the stock exchanged, the excess may be treated as paid-in surplus in the computation of invested capital. Appeal of Cross Mountain Coal Co., 2 B. T. A. 587; Appeal of St. Louis Screw Co., 2 B. T. A. 649; Appeal of Henderson Overland Co., 4 B. T. A. 1088; Opperman Coal Co. v. Commissioner, 6 B. T. A. 1215; Penn Chemical Works v. Commissioner, 7 B. T. A. 442.

I am satisfied that this is a proper application of the statute and am equally satisfied that, under the act of 1917, the actual cash value of the property must be clearly shown as of January 1, 1914. Appeal of Cross Mountain Coal Co., supra. Appeal of West End Consolidated Mining Co., 3 B. T. A. 128.

The Commissioner of Internal Revenue adopted a regulation relative to paid-in surplus. This regulation is found in article 63 of Regulations 41, and reads as follows:

"Art. 63. *When tangible property may be included in surplus.*—Where it can be shown by evidence satisfactory to the Commissioner of Internal Revenue that tangible property has been conveyed to a corporation or partnership by gift or at a value, accurately ascertainable or definitely known as at the date of conveyance, clearly and substantially in excess of the cash or the par value of the stock or shares paid therefor, then the amount of the excess shall be deemed to be paid in surplus. The adopted value shall not cover mineral deposits or other properties discovered or developed after the date of conveyance, but shall be confined to the value accurately ascertainable or definitely known at that time.

"Evidence tending to support a claim for a paid-in surplus under these circumstances must be as of the date of conveyance, and may consist, among other things, of (1) an appraisal of the property by disinterested authorities; (2) the assessed value in the case of real estate; and (3) the market price in excess of the par value of the stock or shares."

The record does not disclose that the plaintiff adduced evidence, either before the Commissioner or the auditor, to support its claim for a paid-in surplus by showing either an appraisal or assessed value of the assets, but the evidence before the auditor tended to show that the shares never had a market value in excess of the par value. Nevertheless, I suppose it is true that if the plaintiff, as a matter of fact, received for the $1,300,000 of its capital stock tangible property having an actual cash value substantially and clearly in excess of the par value of the stock, it would be entitled to have included in its invested capital this excess as paid-in surplus, notwithstanding the provisions of the regulations. But the statute and the regulation clearly impose upon the plaintiff the burden of showing by adequate proof (1) that the stock was issued for tangible property; and (2) that its actual cash value was clearly and substantially in excess of the par value of the shares issued.

For what was the stock issued? The reorganization committee held, under the plan of reorganization, all but $1,500 of the outstanding bonds and 115,646 shares of the common stock of the Copper Company. It had also received from the old stockholders and others who came into the plan of reorganization a little over $300,000. For these bonds, stocks and cash, the plaintiff issued 260,000 shares of its capital stock. The result of this transaction, therefore, was that the original issue of capital stock was paid in with bonds and shares of capital stock of the Copper Company and $300,000 in cash.

The plaintiff, having acquired these securities, then purchased of the receiver, presumably conducting a foreclosure sale under the mortgage or deed of trust securing the bonds of the Copper Company, the fixed assets and property of that company. The price paid was $1,000,000, and the bonds of the Copper Company, which the plaintiff had acquired, were used to pay the purchase price.

While, as a matter of form, the consideration paid for the fixed assets was $1,000,000 of bonds of the old company, surrendered for cancellation, the net result of the several steps taken during the course of reorganization was to pass title to the physical assets of the old company to the plaintiff, against which it had outstanding capital stock of the par value of $1,300,000.

Although the stock had been issued to the secured creditors and certain of the stockholders of the old company, rather than to the Copper Company, they were issued to the reorganization committee only as a matter of convenience, for distribution among those who participated in the reorganization.

The foreclosure sale and the conveyance direct by the receiver to the plaintiff were all part of the same transaction which had

for its ultimate purpose the issue of $1,300,000 of capital stock against the assets of the Copper Company and a certain amount of cash. The law will look to the substance of the transaction rather than to the form of it.

For the purpose of determining the amount of invested capital, I think it makes little difference upon which theory we proceed. If, for $1,300,000 of stock or $1,000,000 of bonds, the plaintiff acquired tangible property which, on January 1, 1914, had an actual cash value of $3,300,000, it has established its rights to have the $2,000,000 added to its invested capital for the year 1917. Appeal of Markenheim Co., 1 B. T. A. 1240.

[8] Did the tangible assets acquired by the plaintiff in July, 1912, have an actual cash value on January 1, 1914, which was $2,000,000 in excess of the par value of plaintiff's stock, issued at the time the property was acquired?

This is the question remaining for consideration.

There is, in the auditor's report, no express finding as to the actual cash value of the property on January 1, 1914, but it\ is possible, from such findings as he did make, to draw the conclusion that the property had on that date an actual cash value substantially and clearly in excess of $1,300,000.

In the first place, it was agreed by the parties that, for the purposes of this case, there was no material change in value of the property between these dates, viz. July 11, 1912, March 1, 1913, and January 1, 1914.

At the plaintiff's request, the auditor found that the plaintiff's invested capital on March 1, 1913, was: Cash, $360,000; and mine, $4,000,000. He also found that the cost of the tangible property of plaintiff was $4,047,553.28, "that being the cost to the Arizona Commercial Copper Company of which the plaintiff company was merely a reorganization."

If, in making these findings, the auditor proceeded on the theory that the invested capital of the plaintiff should be measured by the cost to the old company of the assets taken over by the new, the finding cannot be sustained. Conceding that the incorporation of the plaintiff was a part of the plan of reorganization, there was not sufficient identity of ownership, or control, to warrant the auditor in treating the plaintiff other than as a separate and distinct corporate entity. Holders of less than one-fifth of the stock in the old company participated in the reorganization. A majority of the shares of the new company were issued to holders of bonds of the old company. The plaintiff cannot adopt the invested capital of the Copper Company. It must establish its own. In its accounting and in its returns it proceeded on lines consistent with this view.

The cost of the assets to the old company may, however, be considered as evidence of the actual cash value and is entitled to considerable weight when considered with other findings of the auditor, to the effect that the Copper Company acquired the properties in 1905 and they were carried on the books at the time of the reorganization as—

| | |
|---|---|
| Mines and real estate | $2,069,505 61 |
| Mine development and plant construction | 1,816,211 94 |
| Railroad | 161,835 73 |
| **Total** | **$4,047,553 28** |

The auditor also finds that the value of the ore bodies, as of March 1, 1913, was $2,626,000.

These facts found by the auditor relative to the original cost to the Copper Company and the actual value on March 1, 1913, of the ore bodies, are consistent with his ultimate finding that the invested capital was in excess of $4,000,000, and justify the conclusion that the price of $1,000,000 paid for the fixed assets was merely a nominal value, adopted for the purposes of the reorganization, and did not adequately represent the actual cash value of the property. Considerable stress has been laid upon the fact that in semiannual reports, submitted by plaintiff to stockholders, containing a balance sheet, the assets taken over from the Copper Company have been carried at $1,300,000. The report of December 31, 1913, shows that the mining property and plant were carried at $1,455,238. The report of December 31, 1917, is the first report in which the added value to the mining properties and plant appears, and in this report these properties are valued at $3,732,075.50. I do not suppose that these book values can be taken as conclusive of the plaintiff's rights in the premises. These records merely show that the plaintiff elected to carry on its books nominal, rather than real, values until 1917, when the passage of the excess profits tax rendered it advantageous for it to reflect on its books and in its returns the actual cash value instead of the nominal values.

■ The auditor's report must be taken as prima facie evidence of the material facts therein recited. His findings lend no support to the defendant's contention that the property, acquired by the plaintiff at the time of the reorganization, had an actual cash value of only $1,300,000, except such inference as may be ultimately drawn from the fact

that apparently there was no market for the stock. I cannot deem this as sufficient to override the other express findings of the auditor respecting the value of the ore bodies and the cost of the property. No evidence was offered by the defendant to control these findings.

In conclusion, I am of the opinion that the evidence before me warrants the following conclusions of fact and of law, and I so find and rule:

(1) That the $1,300,000 was in substance, if not in form, issued for tangible property consisting of the mines and other tangible assets of the Arizona Commercial Copper Company.

(2) That the actual cash value of such tangible property on January 1, 1914, was at least $2,000,000 in excess of the par value of the original shares issued therefor.

(3) That the plaintiff is entitled to have included in its invested capital the $2,000,000 disallowed by the Commissioner.

(4) That the additional tax to the extent of $27,325.75 was erroneously assessed upon plaintiff and unlawfully exacted.

(5) That the plaintiff is entitled to recover in this action the sum of $27,325.75, with lawful interest thereon.